IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MARLON GOODWIN, ) | |
| ) | **AMENDED ORDER,** |
| Petitioner, pro se, ) | **MEMORANDUM OPINION,** |
| ) | **AND RECOMMENDATION** |
| v. ) | |
| ) | |
| ALVIN W. KELLER, JR., ) | 1:10CV679 |
| ) | |
| Respondent. ) | |

This matter is before the court primarily on Respondent's motion for summary judgment (docket no. 6). Pro se Petitioner Marlon Goodwin has responded, and the matter is ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge, and the motion must therefore be dealt with by way of recommendation. For the following reasons, it will be recommended that the court grant Respondent's motion.

**I. Procedural Background and Pending Motions**

On September 25, 2006, Petitioner was convicted after a jury trial in the Superior Court of Guilford County of second-degree murder and attempted first-degree murder in case 05 CRS 65887. He was sentenced to consecutive terms of 251-311 and 225-279 months of imprisonment. Petitioner did appeal, but the North Carolina Court of Appeals found no error, and the North Carolina Supreme Court denied discretionary review. *State v. Goodwin*, 190 N.C. App. 570, 661 S.E.2d 46 (2008), *disc. review denied*, 363 N.C. 133, 675 S.E.2d 664 (2009). Petitioner also filed a motion for appropriate relief in Guilford County. That motion was summarily denied. Petitioner sought certiorari from the North Carolina Court of Appeals, but that request was also denied. He then filed his habeas petition in this court.

Currently there are several motions pending in this case. In addition to Respondent's previously mentioned summary judgment motion, there is also a

motion for appointment of counsel by Petitioner (docket no. 4), a motion by Respondent to submit the voluminous transcript from Petitioner's trial on CD-ROM (docket no. 8), a motion by Petitioner to make a minor amendment to one claim of his petition (docket no. 10), a motion by Petitioner for an extension of time to file a response to Respondent's motion for summary judgment (docket no. 12), and a motion to compel Respondent to give Petitioner a copy of the brief supporting its motion for summary judgment and for sanctions (docket no. 14).

Before turning to Respondent's summary judgment motion, the court will briefly address the other pending motions. First, as noted, the court will recommend that Respondent's summary judgment motion be granted. This moots Petitioner's motion for appointment of counsel, and that motion will be denied. Next, the court finds that the presentation of the transcripts in CD-ROM format is appropriate in this case, that Petitioner's proposed amendment will not negatively impact the case, and that Petitioner's request for an extension of time to file a response is also well-made. Respondent's motion regarding the transcripts and Petitioner's motions regarding the amendment and the extension will be granted. Accordingly, the petition is amended as proposed by Petitioner; and both the transcripts and response filed in the record are accepted by the court. Finally, as for Petitioner's motion compelling Respondent to provide him a copy of its supporting brief, that portion of the motion appears moot given that Petitioner has now filed a response. Also, sanctions against Respondent are not appropriate. The motion to compel and for sanctions will be denied.

**II. Facts**

The basic facts of the case, as set out by the North Carolina Court of Appeals in denying Petitioner's direct appeal, are as follows:

> On the evening of 6 January 2005, Kentrell Lamar Coleman ("Coleman") went to 214 Morgan Place to pick up several ounces of cocaine. Coleman entered the house with Alicia Herndon and saw Leonzo, defendant, and two other males, one of whom Coleman later learned was named John.
>
> Coleman testified as follows: Coleman, Leonzo, and defendant talked for a bit, and then defendant left the room. Defendant returned with a gun, telling Coleman, "This is what's up, this is what it is[.]" Coleman reached for his own gun and saw that Leonzo, John, and the other male also had guns out. Coleman thought Leonzo shot first and Coleman later fired five shots. Everyone was shooting. Coleman was shot five times and was hit in his shoulder, hip, knee, back, and thigh. Coleman saw that Herndon was dead. Coleman crawled into another room "waitin' to die."

*Goodwin*, 190 N.C. App. at 571, 661 S.E.2d at 47-48 (footnote omitted).

Other significant facts come from the testimony of Tobin Dejournette, who also testified for the State, but gave a different version of events. Dejournette testified that he, Petitioner, and a man named Leonzo White had met Coleman at a gas station earlier on the day of the shootings. He did not know why they met him. Dejournette, Petitioner, and Leonzo then went to Petitioner's house. There, Petitioner and Leonzo spoke to a man named Harry White. Harry left and later returned with two revolvers. Fifteen or twenty minutes later, Kevin Chunn and Petitioner's brother, John Goodwin, showed up with a shotgun and an assault rifle. Dejournette did not know why all of these guns were brought to the house. There was a phone call to the residence, and Petitioner gave directions to the house to the caller. A little while later Coleman showed up at the residence (trial tr., vol. VIII at 1271-74). While Dejournette and the other men waited in an adjoining room, Coleman talked briefly in the kitchen with Leonzo White and Petitioner. Dejournette next heard "scuffling" in the kitchen and looked into the room. Petitioner, "in a manner of fear" motioned for Dejournette and the other persons in the room to come into the kitchen. Dejournette grabbed the shotgun; and he, John Goodwin (who had the assault rifle), Kevin Chunn, and Harry White took guns into the kitchen. The

guns were drawn. Dejournette testified that Coleman then fell on the floor, pulled his gun, and fired. First Petitioner, and then his brother, returned fire, wounding Coleman. Herndon was killed in the crossfire. Dejournette did not shoot or see anyone else shoot (trial tr., vol. VIII at 1274-77, 1309-13).

### III. Petitioner's Claims

Petitioner raises eight claims for relief in his habeas petition. They are:

(1) Trial counsel provided ineffective assistance by "failing to research and assert the defense of self-defense and or acting in concert to self-defense." Petitioner argues that there was evidence that Coleman was armed and fired the first shots. He faults counsel for not requesting a self-defense instruction at the beginning of the trial, after the trial, and after the jury asked, among other questions, whether there were excuses or causes that they should consider that would make firing a gun at someone not an assault. He adds that counsel also erroneously believed that there was no lesser-included offense to attempted first-degree murder and that counsel did not propose proper responses to the jury's questions in general.

(2) Trial counsel provided ineffective assistance when they did not request a self-defense instruction following the jury's questions and when they failed to preserve for appeal the trial court's denial of a request for a self-defense instruction in response to the jury's questions.

(3) Trial counsel provided ineffective assistance of counsel by failing to research lesser-included offenses of attempted first-degree murder and seek an instruction on them.

(4) There was insufficient evidence to support the second-degree murder conviction because the State could not prove whose bullets killed Herndon, the State did not prove that Herndon's death was caused while Petitioner and his associates were committing an assault with a deadly weapon or robbery, and no instruction was

given on the theory of transferred intent. Petitioner adds that there was no direct evidence of malice as to Herndon.

(5) Appellate counsel was ineffective by not raising a claim that the trial court improperly failed to instruct the jury on involuntary manslaughter even though there was evidence that Herndon's death was the result of negligence in a drug deal that went bad. Petitioner also faults appellate counsel for failing to raise a claim based on trial counsel's failure to request a self-defense instruction.

(6) Trial counsel was ineffective for not objecting to the fact that the trial court gave a "heat of passion" voluntary manslaughter instruction rather than one based on "provocation."

(7) Appellate counsel was ineffective for failing to raise an argument that trial counsel was ineffective because of their erroneous belief that there were no lesser-included offenses to attempted first-degree murder and for failing to seek a jury instruction based on the lesser-included offense of attempted voluntary manslaughter.

(8) There was insufficient evidence to support the attempted first-degree murder conviction. Petitioner points to evidence that Coleman was armed, that the shootings were part of a drug deal, and there was no evidence that Petitioner and his associates intended to rob or assault Coleman or that they planned to kill him prior to the shootout.

## IV. Standards of Review

Where a petitioner's claims were adjudicated by the state courts on their merits, this court must apply 28 U.S.C. § 2254(d)'s highly deferential standard of review to such claims. That statute precludes habeas relief in cases where a state court has considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as set out by

the United States Supreme Court or the state court decision was based on an unreasonable determination of the facts. A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. "Unreasonable" is not the same as "incorrect" or "erroneous;" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. *Id.* at 409-11. As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, the substance of Petitioner's claims appears to have been raised in his motion for appropriate relief to the state trial court.[1] They were decided and denied, at least alternatively and in a summary fashion, on their merits. Therefore, the standards just set out do apply to Petitioner's claims. *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court need not even be aware of United States Supreme Court precedent for deferential standards of review to apply); *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) ("In this case, the North Carolina state court did not articulate the rationale underlying its rejection of [the petitioner's] Sixth Amendment claim. However, we may not presume that the summary order is indicative of a cursory or

---

[1] To any extent that the claims were not raised, they would then be unexhausted and procedurally barred. They would also fail on the merits even if the Section 2254 standards of review did not apply.

haphazard review of the petitioner's claims. Rather, the state court decision is no less an adjudication of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1)." (internal brackets and quotation marks omitted)).

## V. Discussion

### A. Claims One, Two, Three, and Seven

As noted, Petitioner's first two claims for relief allege that his trial attorneys failed him by not seeking jury instructions related to self-defense, by not properly answering the jury's questions, and by erroneously believing that there was not a lesser-included offense to attempted first-degree murder. Claim Three also faults his trial attorneys for not researching and seeking an instruction based on lesser-included offenses to attempted first-degree murder. In Claim Seven, Petitioner contends that appellate counsel was ineffective for failing to raise trial counsels' erroneous belief about the lack of a lesser-included offense for attempted first-degree murder on appeal.

An ineffective assistance of counsel claim is evaluated by using a two-part test:

> In order to establish an ineffective assistance of counsel claim . . . [a petitioner is] required to establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S. Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S. Ct. 2052.
>
> In determining whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S. Ct. 2052. Hence, "court[s] must

-7-

> indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).
>
> Similarly, in evaluating whether the defendant has shown actual prejudice from any such deficient performance, it is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693, 104 S. Ct. 2052. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. 2052. When challenging a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S. Ct. 2052.

*Fisher v. Lee*, 215 F.3d 438, 446-447 (4th Cir. 2000).

As for ineffective assistance of appellate counsel, such claims are judged using the *Strickland* test just set out. *See Lawrence v. Branker*, 517 F.3d 700, 708-09 (4th Cir. 2008). Appellate counsel need not raise on appeal every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745 (1983); *see also Smith v. Murray*, 477 U.S. 527 (1986); *Evans v. Thompson*, 881 F.2d 117, 124 (4th Cir. 1989) (declaring that counsel pursued sound strategy when he "determined what he believed to be petitioner's most viable arguments and raised them on appeal"). Winnowing out weaker arguments to press forward with more important points is part of effective appellate advocacy. *Jones*, 463 U.S. at 751-52. Prejudice can be shown by demonstrating that "'counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.'" *Bell v. Jarvis*, 236 F.3d 149, 180 (4th Cir. 2000) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

Petitioner's primary contention is that his attorneys did not seek a self-defense instruction, either at the beginning of his trial, the end of it, or in response to jury

questions. In denying this claim, the judge deciding Petitioner's motion for appropriate relief stated:

> With respect to Claim 1, however, the record submitted by the defendant or present in the file clearly shows a conscious decision by counsel not to place self-defense before the jury. The reason for this decision is not expressed in the record, but it is not difficult to understand that if the strategy includes [an] attempt to raise a doubt on whether any shot fired by the defendant caused any injury or death, then self-defense is hardly a part of that strategy. The decision is squarely within the admonition that strategic and tactical decisions made by counsel at trial are to be afforded great deference. This claim is without merit.

(Docket No. 7, Ex. 10.)

Although not citing specifically to *Strickland*, the state court's adjudication of the matter used the correct standards to evaluate the claim. Its decision is also not contrary to, or an unreasonable application of that or other Supreme Court precedent. As Respondent points out, Petitioner was tried capitally and, therefore, faced the possibility of the death penalty if convicted of first-degree murder in Herndon's death. It was quite clear that counsels' main objective would have been to avoid this outcome. Counsel chose to meet this goal by advancing a theory that, while Petitioner was involved in the incident where Coleman was shot and Herndon killed, he fired only two shots and his shots were not the ones that hit and killed Herndon. This was certainly a reasonable strategy. As Respondent points out, presenting an alternative theory based on self-defense would have risked losing credibility with the jury. It could also have added confusion to what was otherwise a relatively clear defense strategy. This would have rendered any claim of self-defense by Petitioner a high-risk, high-reward tactic, with Petitioner's life at stake.

Balanced against this was the chance that the jury would actually credit any self-defense argument. Under North Carolina law,

> It is well settled that perfect self-defense which excuses a killing altogether arises where, at the time of the killing:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Maynor*, 331 N.C. 695, 699, 417 S.E.2d 453, 456 (1992).

There was no apparent way for defense counsel to have requested an instruction for perfect self-defense in this case, much less to have argued it credibly to the jury. Nor could a reasonable juror have found that the elements of perfect self-defense were met. Coleman testified that Petitioner was the aggressor in the situation, that he pulled a gun and threatened Coleman with it, and that Petitioner and his associates fired first. Petitioner points to the testimony of Dejournette for support. Even under Dejournette's description of events, however, a scuffle occurred; and Petitioner then had a group of men armed with guns enter the room where the scuffle happened. Petitioner also drew his gun. This led to the fatal shootout. Whether Coleman or Dejournette's version of events was credited by the jury, the result would be the same. Petitioner was clearly an aggressor who brought firearms into an affray. He could not successfully claim perfect self-defense.

Petitioner argues that his attorneys should have asked for an instruction based on "acting in concert to self-defense." It is not clear what he means by this phrase; however, there appear to be at least two possibilities. One is that he means he was acting in the defense of others. Defense of others is a potential defense in North

Carolina; however, it is available only under the same conditions as defense of oneself, which, as noted, was not available to Petitioner based on the evidence in the record. *State v. Phifer*, 165 N.C. App. 123, 129, 598 S.E.2d 172, 176 (2004) ("elements of self-defense are applicable to defense of others").

Petitioner may also mean that his attorneys should have raised imperfect self-defense. That can be raised in a situation where the first two elements of self-defense are present, but the third and/or fourth are not. *Maynor* at 699, 417 S.E.2d at 465. Even this limited form of self-defense was likely unavailable to Petitioner. According to Dejournette's testimony, Petitioner and/or someone else had gotten into a "scuffle" in the kitchen of the house where the shootings occurred. Petitioner motioned to several armed men and had them come into the kitchen. It was only at this point, in response to being confronted by the armed men, that Coleman drew his own gun and fired according to Dejournette. Nothing in Dejournette's testimony would have given Petitioner reasonable grounds to gather the men and engage in an armed confrontation that resulted in the shootings. Likewise, nothing in his testimony shows that Petitioner or anyone else in the house was in fear of death or great bodily harm until Petitioner created that danger. Therefore, even the first and second elements of the defense did not exist. Further, imperfect self-defense is not available where a person enters an affray with "murderous intent." *See State v. Reid*, 335 N.C. 647, 440 S.E.2d 776 (1994). Having a group of heavily armed men to enter a room where a "scuffle" had just occurred could certainly be seen by a jury as entering with "murderous intent," particularly in light of Petitioner's gathering the men and guns prior to Coleman's impending arrival at the house.

In the end, Petitioner's attorneys were faced with a situation where a perfect self-defense/defense of others instruction was not even remotely an option based on the evidence; and it was far from certain that the trial judge would have even

given an imperfect self-defense/defense of others instruction. Moreover, even had the attorneys been successful in having an imperfect self-defense instruction read to the jury, there was not a reasonable possibility of a different outcome; and the defense's credibility with the jury could have been harmed. It is true, as Petitioner points out, that jurors asked, "If [sic] firing a gun in response to gunfire assault?" and "Are there excuses or causes that we should consider that would make firing a gun at someone not assault?" (trial tr., vol. XI, at 1632). Nevertheless, these questions appear aimed more at felony-murder considerations (a theory raised by the State) than self-defense. Also, they do not mean that, once instructed on the law as set out above, the jury would have then found imperfect self-defense. In fact, the testimony in the case, when considered in light of the actual law, would make such a finding unlikely.

On the other hand, Petitioner's attorneys also had available the much more viable argument that Petitioner did not fire the fatal shots. Therefore, they made a strategic decision, after consulting with Petitioner in court (*see Goodwin*, 190 N.C. App. at 572-574, 661 S.E.2d at 48-49), that they would not pursue self-defense, but would instead argue that Petitioner did not shoot the victims. It was on the basis of that choice that the state court found that Petitioner could not show ineffective assistance of counsel under the *Strickland* standards. For all of the reasons set out above, that decision was not contrary to, or an unreasonable application of *Strickland*. Nor has Petitioner shown either the error by counsel or the prejudice necessary to prevail in this court. His claims that his attorneys failed him in not seeking self-defense instructions should be denied.[2]

---

[2] In Petitioner's amendment to his petition, he alters Claim Two to add that his attorneys failed to raise an objection and preserve for appeal the trial court's "denial of the request for a self-defense instruction in response to the jury's note" (docket no. 10). This claim should also be denied. There was no denial of any request
(continued...)

Petitioner also argues that his attorneys erred in failing to research and seek a jury instruction for lesser-included offenses of attempted first-degree murder. He claims that such offenses exist, but that his attorneys, the trial judge, and the prosecutor discussed the matter and incorrectly concluded that none existed. This argument is at least possibly supported by the record. The trial judge and counsel for both sides did discuss the possibility of a lesser-included offense instruction for attempted first-degree murder; but, after it was noted that there was no such crime a attempted second-degree murder, no lesser-included instruction was given (trial tr., vol. IX at 1483-84). It is not entirely clear from the discussion whether the parties were assuming that no lesser-included offense existed, or only that no instruction on one was appropriate. The court will assume purely for purposes of deciding Respondent's summary judgment motion that they concluded that none existed.

Assuming that Petitioner's trial attorneys did believe that no lesser-included offense existed for attempted first-degree murder, this was incorrect. As Respondent candidly concedes, the crime of attempted first-degree murder in North Carolina does have the lesser-included offense of attempted voluntary manslaughter. *State v. Hames*, 170 N.C. App. 312, 612 S.E.2d 408 (2005). It occurs where a defendant does intend to kill the victim, but the defendant is held responsible only for the general intent, not the specific intent, because of a lack of premeditation and deliberation. The defendant must be acting under the same legally adequate provocation as would allow a finding of voluntary manslaughter. *Id.* That is, the attempted killing must be done intentionally, but "without premeditation, deliberation or malice but [while under] the heat of passion suddenly

---

²(...continued)
because defense counsel did not make any request. Therefore, there was no potential error to preserve.

aroused by adequate provocation." *State v. Wallace*, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983). Attempted voluntary manslaughter also occurs where imperfect self-defense is successfully asserted. *State v. Norris*, 303 N.C. 526, 529-530, 279 S.E.2d 570 (1981).

**Here, as noted, even the testimony in the case that was most favorable to Petitioner did not tend to support imperfect self-defense**.[3] That same testimony also would not have supported a finding that Petitioner was acting under the "heat of passion" in response to "adequate provocation." Instead, in response to what may have been an unarmed "scuffle" (Dejournette testified to the sound of a "scuffle," but did not witness any fight or other altercation), Petitioner summoned several men with guns into the room to confront Coleman. Petitioner had previously gathered the guns and supplied them to the men while knowing that Coleman would be coming to the house. There was no evidence of any adequate provocation. Of course, Coleman's testimony would indicate that there was no provocation whatsoever. Either way, Petitioner cannot show the prejudice required to succeed on his ineffective assistance of counsel claim. To be sure, the state court's adjudication of the issue passes muster under the Section 2254 standards. This claim should also be denied.

Petitioner next asserts that his attorneys, despite having access to computer assisted research, did not formulate an adequate response to the jury's questions in the case. Petitioner does not suggest any specific response that was needed other than the self-defense instruction already discussed above. He cannot prevail

---

[3] The purpose of this amended order, memorandum opinion, and recommendation is to insert the word "not" in this sentence, which was omitted by oversight in the original filing.

on that point for the reasons already set out. Otherwise, this allegation is conclusory and should be denied as such. *Nickerson v. Lee*, 971 F.2d 1125 (4th Cir. 1992).

Finally, Petitioner's seventh claim for relief faults appellate counsel for failing to raise on appeal his attorneys' failure to seek a jury instruction for attempted voluntary manslaughter. As already discussed, Petitioner's claims that such an instruction was warranted and that he was prejudiced by the failure to ask for it do not merit relief. For the same reasons, there was no real prospect that the claim would have fared better on appeal than it did in Petitioner's motion for appropriate relief or his current habeas petition. Appellate counsel did not err by failing to raise the claim, and Petitioner could not have been prejudiced. The claim fails and should be denied.

### B. Claim Four

Petitioner's fourth claim for relief argues that there was insufficient evidence to convict him of second-degree murder in Herndon's death. In a habeas corpus action, the standard of review for a claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). A court reviewing the sufficiency of the evidence "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). It has further been held that "circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis consistent with innocence." *United States v. George*, 568 F.2d 1064, 1069 (4th Cir. 1978). The standard is obviously rigorous; however, as the Supreme Court has reiterated, "the writ of habeas corpus has historically been

regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).

"The elements of second-degree murder in North Carolina are that '1. defendant killed the victim; 2. defendant acted intentionally and with malice; and 3. defendant's act was a proximate cause of the victim's death.'" *State v. Bethea*, 167 N.C. App. 215, 218, 605 S.E.2d 173, 177 (2004) (quoting *State v. Bostic*, 121 N.C. App. 90, 98, 465 S.E.2d 20, 24 (1995)). Petitioner argues that the state could not prove that he killed Herndon "only that [his] acts brought about Herndon's death" when she was killed in the crossfire between Coleman and Petitioner and his associates (docket no. 2, ground 4). He adds that the state also did not prove that Herndon was killed during an attempted assault with a deadly weapon or robbery attempt by Petitioner and his associates.

As for the first element, that Petitioner killed Herndon, it is true that the state could not show that he was definitely the person who shot her, only that there was a chance that he was the person that shot her. There was evidence that he fired a gun in the shootout, but the bullets that hit Herndon could not be linked to any particular gun (trial tr., vol. VII at 1070-75). Nevertheless, there was also evidence that Petitioner's associates, who were in the room and armed at his behest, fired numerous shots. The State proceeded on the theory that Petitioner and the others were acting in concert during the shootings. There was certainly sufficient evidence of this. Therefore, there was evidence from which the jury could find Petitioner responsible for killing Herndon, either directly or in concert with his associates. This also satisfies the third element that Petitioner must have proximately caused Herndon's death.

As for the second element, there is evidence from which a jury could find that Petitioner acted intentionally and with malice. "[M]alice may be inferred '"when an

act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief."'" *Bethea*, 167 N.C. App. at 218, 605 S.E.2d at 177 (quoting *State v. McBride*, 109 N.C. App. 64, 67-68, 425 S.E.2d 731, 733 (1993)). Coleman's testimony was that Petitioner crowded Coleman, Herndon, and several men armed with guns into a small, enclosed area, that Petitioner taunted Coleman with a gun, and that the men then opened fire when Coleman reached for his own weapon. Under Coleman's testimony and Dejournette's testimony, Petitioner was responsible for creating this situation and for the gun fight that killed Herndon. To be sure, the jury could have inferred malice based on Petitioner's actions the night Herndon was killed. Petitioner's insufficiency claim is without merit, the state court's denial of his insufficiency claim as raised in the motion for appropriate relief was not contrary to, or an unreasonable application of, Supreme Court precedent, and Petitioner's fourth claim for relief should be denied.

### C. Claim Five

Petitioner's fifth claim for relief faults his appellate counsel for failing to raise issues regarding (1) the trial court's failure to give an involuntary manslaughter instruction on the theory that Herndon's death was the negligent result of a drug deal gone bad and (2) trial counsels' failure to request a self-defense instruction. Obviously, the claim concerning the self-defense instruction fails for reasons already stated. Counsel was not ineffective for failing to raise a claim that did not have merit. As for the involuntary manslaughter issue, that requires only a little more discussion.

"Involuntary manslaughter is a common law offense. 'The elements of involuntary manslaughter are: (1) an unintentional killing; (2) proximately caused by either (a) an unlawful act not amounting to a felony and not ordinarily dangerous to human life, or (b) culpable negligence.'" *State v. Davis*, 198 N.C. App. 443, 680

S.E.2d 239 (2009) (quoting *State v. Hudson*, 345 N.C. 729, 733, 483 S.E.2d 436, 439 (1997) (citations omitted)). Creating and engaging in a shootout where several people are shooting in a small room is ordinarily dangerous to human life. Also, it is far more than negligence. Given the evidence in the case, there was no basis for that instruction and no reasonable chance that the argument assigning error to the trial judge's failure to give the instruction would have succeeded on appeal. Again, Petitioner's proposed claim on appeal was without merit. Petitioner's fifth claim for relief should be denied.

### D. Claim Six

Petitioner's sixth claim for relief asserts that he received ineffective assistance of counsel when his trial attorneys did not object to the trial court giving the wrong voluntary manslaughter instruction. This claim is based on a misunderstanding of North Carolina law. Petitioner believes that a voluntary manslaughter conviction can be based on either "heat of passion" or "adequate provocation" and that the trial judge gave a "heat of passion" instruction when the evidence supported an "adequate provocation" instruction instead. Unfortunately for Petitioner, the basis for voluntary manslaughter is that a defendant acted under the "heat of passion suddenly aroused by adequate provocation." *Wallace*, 309 N.C. at 149, 305 S.E.2d at 553. This is one theory, not two. The trial judge gave the correct instruction (trial tr., vol. X. at 1602-3), there was no reason for defense counsel to have objected, the state court's denial of this claim was correct, and the claim should be denied.

### E. Claim Eight

Petitioner's eighth, and final, claim for relief is that there was insufficient evidence to support his attempted first-degree murder conviction. Petitioner points to evidence that Coleman was armed and that the shootings were part of a drug deal. He also claims that there was no evidence that Petitioner and his associates

intended to rob or assault Coleman or that they planned to kill him prior to the shoot-out. This claim must be evaluated under the same standards discussed earlier in conjunction with Petitioner's fourth claim for relief.

"'First-degree murder is, inter alia, the unlawful killing of a human being committed with malice, premeditation, and deliberation.'" *State v. Bedford*, ___ N.C. ___, 702 S.E.2d 522, 526 (N.C. App. 2010) (quoting *State v. Geddie*, 345 N.C. 73, 94, 478 S.E.2d 146, 156 (1996)).[4] Further,

> Premeditation and deliberation generally must be established by circumstantial evidence, because they ordinarily are not susceptible to proof by direct evidence. "Premeditation" means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. "Deliberation" means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.

*Id.* at 527 (quoting *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991)).

> Premeditation and deliberation can be proved by circumstances including:
>
> (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulties between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*Id.* (quoting *State v. Gladden*, 315 N.C. 398, 430-31, 340 S.E.2d 673, 693, (1986)). Premeditation and deliberation can be found even though a defendant is angry or emotional. *Id.*

Here, Dejournette testified that Petitioner and Leonzo White talked to Coleman at a gas station, went back to Petitioner's house, and had other persons bring at least four guns, including an assault rifle, to the house. Petitioner then gave

---

[4] There are other theories of first-degree murder, but they are not relevant here.

directions to Coleman to come to the house. According to Coleman, Petitioner and his associates drew guns on him while Petitioner taunted him despite a lack of any provocation. From this evidence, the jury could have concluded that Petitioner planned to kill Coleman in a premeditated and deliberate manner. The jury could also have found premeditation and deliberation when, according to Dejournette's testimony, Petitioner summoned men armed with several guns into the kitchen where a scuffle had just occurred. To be sure, while this was not the only conclusion that could have been reached, it was a supportable one. Petitioner's eighth claim for relief should be denied.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Respondent's motion to submit the transcripts on CD-ROM (docket no. 8), Petitioner's motion to amend (docket no. 10), and Petitioner's motion for an extension of the time to respond (docket no. 12) are all **GRANTED** and that Petitioner's motions for appointment of counsel (docket no. 4) and to compel and for sanctions (docket no. 14) are **DENIED**.

Furthermore, **IT IS RECOMMENDED** that Respondent's motion for summary judgment (docket no. 6) be **GRANTED** and the habeas petition (docket no. 2) be **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, N.C.
April 14, 2011